## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 40514

HAP TAYLOR & SONS, INC., d/b/a KNIFE
RIVER, an Oregon corporation,

    Plaintiff-Cross Respondent,

v.

SUMMERWIND PARTNERS, LLC, a
Nevada limited liability corporation,

    Defendant-Cross Appellant,

v.

IDAHO GOLF PARTNERS, INC.,

    Intervenor-Respondent-Cross
    Appellant.
_____

CONGER MANAGEMENT GROUP, INC.,
an Idaho corporation,

    Plaintiff-Counterdefendant-Cross
    Defendant-Respondent,

v.

STANLEY CONSULTANTS, INC.,

    Defendant-Counterclaimant-Cross
    Claimant-Appellant,

and

INTEGRATED FINANCIAL ASSOCIATES,
INC., a Nevada corporation,

    Defendant-Counterdefendant-
    Cross Defendant-Respondent-Cross
    Appellant,

and

Boise, August 2014 Term

2014 Opinion No. 119

Filed: November 13, 2014

Stephen W. Kenyon, Clerk

1

GENEVA EQUITIES, LLC, an Idaho limited liability company; and RIVERSIDE, INC., an Idaho corporation,

    Defendants-Counterdefendants-Cross Defendants-Respondents,

and

IDAHO GOLF PARTNERS, INC.,

    Intervenor-Respondent-Cross Appellant,

and

AMERICAN COUNCIL OF ENGINEERING COMPANIES OF IDAHO,

    Intervenor-Appellant.

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Juneal C. Kerrick, District Judge.

District court judgments are <u>vacated</u> and the case is <u>remanded</u>.

Givens, Pursley, LLP, Boise, for appellant, Stanley Consultants, Inc. Thomas E. Dvorak argued.

Fisher Rainey Hudson, Boise, for Summerwind Partners, LLC, Integrated Financial Associates, Inc., and Geneva Equities. Rebecca A. Rainey argued.

Moffatt, Thomas, Barrett, Rock and Fields, Chtd., Boise, for Geneva Equities.

Eberle, Berlin, Kading, Turnbow & McKlveen, Boise, for Conger Management Group.

Eismann Law Offices, Caldwell, for Riverside, Inc.

Fisher, Pusch & Krueck, LLP, Boise, for Hap Taylor & Sons, Inc. David T. Krueck argued.

Mark D. Perison, PA, Boise, for Idaho Golf Partners, Inc. Mark D. Perison argued.

Clark Feeney, Lewiston, for American Council of Engineering Co. of Idaho.

BURDICK, Chief Justice

This case consolidated several individual cases dealing with common claims for nonpayment against the developer of the Summer Wind at Orchard Hills residential and golf course development in Canyon County, Idaho. There are essentially two distinct cases on appeal. First, Stanley Consulting, Inc. ("Stanley") appeals the district court's decision as to the priority date for Stanley's engineer's lien pursuant to Idaho Code section 45-506. Second, Integrated Financial Associates, Inc. ("IFA") cross-appeals the district court's decision granting Knife River's summary judgment motion based on the court's decision that Knife River had a valid priority lien for paving work it did on roadways and golf cart paths without having to designate the lien between the two projects. We vacate the district court's judgments and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves the infrastructure development of a residential subdivision and golf course located near Greenleaf, Idaho. The name of the project was Summer Wind at Orchard Hills ("Summer Wind Development"), and the owner and developer was Union Land Company ("Union Land").[1] Summer Wind Development was a multi-use development made up of approximately 91 residential building lots and a golf course and involved two phases. Union Land contracted to begin work in the summer of 2006, later recording the plats for Phases I and II on February 2, 2007.

Union Land contracted with Extreme Line Logistics, Inc. ("ELL") for portions of the project and ELL then sought a subcontractor for paving work required throughout Summer Wind Development. Hap Taylor & Sons, Inc. d/b/a Knife River ("Knife River") submitted a proposal ("Knife River Proposal") to furnish, place, and compact approximately 6,020 tons of asphalt at the rate of $64.50 per ton, and ELL subsequently accepted that Proposal. Knife River began work on the project on August 22, 2006. Knife River began paving sections of the dedicated roadways in the residential portions of the Summer Wind Development in November 2006. Almost a year later, on August 16, 2007, ELL requested that Knife River prepare a change order estimating its cost for supplying asphalt for and paving golf cart paths for the Summer Wind

---

[1] Union Land Company appears to be the same organization, at least for the purposes of this appeal, as Summerwind, LLC.

Development. Knife River subsequently prepared a Small Job Worksheet reflecting the additional paving work.

On June 18, 2007, Stanley entered into a Professional Services Agreement with Union Land to provide engineering services for Summer Wind Development. That contract included creating a topographical map sufficient to design the golf clubhouse, parking lot and drainage facilities, as well as designing and preparing a grading and drainage plan for the clubhouse and parking facilities, and then project administration services. On June 26, 2007, Stanley employee Steven Arnold recorded 1.5 hours of time for a project described as the "Summer Wind Club House" under the task number for "project administration."

Union Land sought financing from IFA, which IFA provided and secured by recording deeds of trust against the Summer Wind Development in the amount of $9,500,000 on July 13, 2007. While Stanley recorded work done on project administration before IFA recorded its deed of trust, it first performed work constituting on-site physical improvements to Summer Wind Development on July 19, 2007.

Knife River discontinued its work on the Summer Wind Development due to ELL's nonpayment for Knife River's work furnishing, placing, and compacting asphalt through August 29, 2007. On October 25, 2007, Knife River recorded liens against Phases I and II of the Summer Wind Development for $217,385.82.

IFA foreclosed its deeds of trust against the Summer Wind Development on January 29, 2009, and March 17, 2009. Summer Wind Partners obtained title to the Summer Wind Development property through a series of trustee's deeds, and on February 15, 2011, recorded a Special Warranty Deed to its golf course lots to Idaho Golf Partners ("IGP").

On April 22, 2008, Knife River filed a complaint seeking to foreclose its materialmen's liens. IFA, along with certain other named defendants, answered Knife River's complaint on July 7, 2008. Stanley's lien on this project is on land related to a clubhouse on a common area lot within the subdivision, and thus overlaps with Knife River's lien claims. Consequently, on July 17, 2008, Stanley filed an answer, counterclaim and cross-claim to Knife River's complaint. Stanley's counterclaims and cross-claims sought to validate and establish the priority date of Stanley's lien against all interested parties. These cases were consolidated on March 2, 2009.

Knife River filed a summary judgment motion on December 9, 2009, seeking to foreclose its materialmen's lien claims. IFA also filed a summary judgment motion on the same day

4

seeking to invalidate Knife River's lien claims. Stanley then filed a summary judgment motion on December 10, 2009, seeking an order of priority, validity, and amount of its lien.

Following a hearing on the summary judgment motions, the district court entered its decision on April 13, 2010. With regard to the priority date of Stanley's lien claim, the district court denied Stanley's summary judgment motion, holding Idaho Code section 45-506's language allowed an engineer's claim of lien to relate back only to the first date actual physical work was conducted on the property at issue. As to Knife River's lien claims, the district court entered summary judgment in favor of Knife River, holding Knife River's liens were valid and superior to IFA's deed of trust. IFA subsequently challenged the district court's decision granting Knife River summary judgment. Following several subsequent motions and pleadings to that end, the district court entered a Judgment and Decree of Foreclosure related to Knife River's lien claims on October 26, 2012.

In the meantime, Stanley, Knife River, IFA, and others had executed a Stipulation for Reconsideration and Entry of Certified Judgment on September 26, 2012 ("Stipulation") as to the judgment on Stanley's lien claim. Among other things, the Stipulation requested that the district court enter a final, certified appealable judgment denying Stanley's summary judgment motion based on the district court's decision that the priority date for an engineer's lien is the date actual physical work was performed on-site.

Based on the Stipulation, the district court entered a certified judgment on Stanley's summary judgment motion on October 16, 2012. On November 26, 2012, Stanley filed its Notice of Appeal from the certified judgment, challenging the district court's decision as to the priority date for its engineer's lien. Then, on December 6, 2012, IFA filed its Notice of Appeal, challenging the district court's decision granting Knife River's summary judgment motion.

The Idaho Supreme Court remanded Stanley's appeal to the district court because the October 16, 2012 Certified Judgment did not qualify as a final judgment. On remand, the district court entered an Order Clarifying Determination on Reconsideration after Remand ("Reconsideration Order"), and a Judgment, on March 15, 2013. Stanley subsequently filed a motion for reconsideration of that Order and Judgment, believing the Order and Judgment's language contradicted the parties' Stipulation and requesting the court to reconsider and enter judgment including language that would preserve Stanley's right to appeal.

Following a hearing on August 8, 2013, the district court entered its final judgment as the parties requested. On August 16, 2013, Stanley filed its First Amended Notice of Appeal challenging the August 8, 2013 Judgment. On appeal, Stanley challenges the district court's decision that the priority of an engineer's lien under Idaho Code section 45-506 relates back only to the first date actual physical work was performed on-site. On cross-appeal, IFA challenges the district court's decision granting Knife River summary judgment. IFA claims the district court erred twice: first, by allowing Knife River to tack two separate projects together thereby reviving an expired lien on the roadway; and second, by concluding that Idaho Code section 45-508 did not require Knife River to designate on its claims of lien the amounts due for the roadways and the cart paths. Alternatively, IFA argues that the district court erred by entering a judgment and decree of foreclosure without first taking evidence regarding the amount of land necessary for the convenient use and occupation of the liened res.

## II. ISSUES ON APPEAL

1. Whether the district court erred when it determined the priority of an engineer's lien under Idaho Code section 45-506 relates back only to the first date physical work was performed on-site.

2. Whether Knife River was required to file two separate liens for the work it did on roadways and golf cart paths.

3. Whether the district court erred when it determined Knife River was not required to designate its lien amounts on the roadways and cart paths under Idaho Code section 45-508.

4. Whether the district court erred by entering a judgment and decree of foreclosure in favor of Knife River without first taking evidence regarding the amount of land necessary for the convenient use and occupation of the liened res pursuant to Idaho Code section 45-505.

## III. STANDARD OF REVIEW

This Court reviews a motion for summary judgment pursuant to the same standards as the district court. *Mackay v. Four Rivers Packing Co.*, 145 Idaho 408, 410, 179 P.3d 1064, 1066 (2008). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c). "[A]ll reasonable inferences that can be drawn from the record are to be drawn in favor of the nonmoving party," and disputed facts will be liberally construed in favor of the nonmoving party. *Mackay*, 145 Idaho at 410, 179 P.3d at 1066. The fact that the parties have filed cross-

motions for summary judgment does not in and of itself establish that there is no genuine issue of material fact—it does not change the applicable standard of review and this Court must evaluate each party's motion on its own merits. *Stafford v. Klosterman*, 134 Idaho 205, 206, 998 P.2d 1118, 1119 (2000). This Court exercises free review over questions of law. *Martin v. Camas Cnty. ex rel. Bd. of Comm'rs*, 150 Idaho 508, 511, 248 P.3d 1243, 1246 (2011).

## IV. ANALYSIS

As previously indicated, this appeal consists of essentially two distinct cases. First, Stanley appeals the district court's decision that its engineer's lien only relates back to the date physical work was performed on-site. IFA is the respondent in Stanley's appeal. Second, there is IFA's cross-appeal, which challenges the district court's decision granting summary judgment in favor of Knife River. IGP intervened, joining IFA as a cross-appellant. IFA and IGP challenge the district court's decision that Knife River had a valid priority lien for Knife River's work on both the roadways and the golf cart paths even though Knife River did not designate the lien between these two projects. Because the initial appeal and the cross-appeal deal with discrete issues and facts, they will be addressed separately below.

**A. Stanley Consulting's Appeal and IFA's Response.**

1. <u>The priority of an engineer's lien under Idaho Code section 45-506 relates back to the date the engineer commenced to furnish any authorized, professional services related to a development project.</u>

In denying Stanley's summary judgment motion, the district court held that Idaho Code section 45-506's language allows an engineer's lien claim to relate back only to the first date actual physical work was conducted on the property at issue. Therefore, Stanley's appeal involves the legal question of whether an engineer's lien priority dates to the commencement of any professional services under a contract related to a development project, or only to services performed on-site.

Two statutes are in play here. First, Idaho Code section 45-501 states in relevant part:

[E]very professional engineer or licensed surveyor under contract who prepares or furnishes designs, plans, plats, maps, specifications, drawings, surveys, estimates of cost, on-site observation or supervision, or who renders any other professional service whatsoever for which he is legally authorized to perform in connection with any land or building development or improvement, or to establish boundaries, has a lien upon the same for the work or labor done or professional services or materials furnished, whether done or furnished at the instance of the owner of the building or other improvement or his agent.

7

Second, Idaho Code section 45-506 states that liens under chapter 45 of the Idaho Code are

> preferred to any lien, mortgage or other encumbrance which may have attached subsequent to the time when the building, improvement or structure was commenced, work done, equipment, materials or fixtures were rented or leased, or materials or professional services were commenced to be furnished . . . .

This Court interprets statutes "according to their plain meaning, and when they are unambiguous, this Court gives effect to the legislature's clearly expressed intent." *Trotter v. Bank of N.Y. Mellon*, 152 Idaho 842, 846–47, 275 P.3d 857, 861–62 (2012).

The district court held that the key question regarding the priority of an engineer's mechanic's lien is whether visible construction commenced before the lender filed its deed of trust. In reaching this decision, the district court relied on *Walker v. Lytton Savings*, 465 P.2d 497 (Cal. 1970), which interpreted a similar California statute. However, the district court's reliance on *Walker* was misplaced. Although similar in some respects, the California statute addressed in *Walker* does not contain some important language found in Idaho Code section 45-506.[2] Specifically, Idaho Code section 45-506 contains additional language stating that a mechanic's lien is also preferred over any mortgage which attached after "materials or professional services were commenced to be furnished." I.C. § 45-506. Therefore, *Walker* is not instructive in this case, and the question before this Court is whether Stanley "commenced to furnish professional services" before IFA filed its deed of trust.

IFA contends that the phrase "commenced to be furnished," as used in Idaho Code section 45-506, requires something more than just beginning professional services because Idaho Code section 45-501 creates a distinction between preparing, rendering, and furnishing professional services. Specifically, IFA argues that the use of the words "prepares," "furnishes," and "renders" when discussing activities that give rise to lien rights stands in contrast to the use of only the word "furnished" when establishing the actual lien. Accordingly, IFA contends that

---

[2] The court in *Walker* provided the following excerpt of the California mechanic's lien statute that applied at the time:

> The liens provided for in this chapter, except as otherwise . . . . provided, are preferred to any . . . . deed of trust, or other encumbrance upon the premises and improvements . . . . which may have attached subsequent to the time when the building, improvement, structure, or work of improvement in connection with which the lien claimant has done his work or furnished his material was commenced; also to any . . . . Deed of trust, or other encumbrance of which the lien claimant had no notice and which was unrecorded at the time the building, improvement, structure, or work of improvement . . . . was commenced . . . . '

*Walker*, 465 P.2d at 498.

the word "furnished" and the phrase "commenced to be furnished" contemplate the act of delivering, giving over, or providing; not just merely preparing or doing. IFA points to the Idaho Court of Appeals case *Beall Pipe & Tank Corp. v. Tumac Intermountain, Inc.*, 108 Idaho 487, 700 P.2d 109 (Ct. App. 1985), to further support this argument. In that case, the Court of Appeals interpreted the phrase "commenced to be furnished," when used in reference to materialmen, to mean the date when materials were first delivered on-site. *Id.* at 492, 700 P.2d at 114. IFA argues that the word "furnishes" should have the same meaning in both sections 45-501 and 45-506. IFA also argues that the word "furnishes" should have the same meaning when applied to those providing professional services as it does when applied to those providing materials. This argument is not convincing because *Beall* dealt with materialmen, and providing professional services is fundamentally different than providing materials, particularly when Idaho Code section 45-501's broad language is taken into account.

Stanley interprets these statutes to state that an engineer's mechanic's lien priority dates back to when the engineer first rendered professional services under contract, regardless of where the services were rendered. Stanley relies on *Ultrawall, Inc. v. Wash. Mut. Bank*, 135 Idaho 832, 25 P.3d 855 (2001), to support this argument. We agree with Stanley's interpretation, but not because of *Ultrawall*—that case is not instructive here because it dealt with bootstrapping lien claims together, not how "commenced to be furnished" should be interpreted for purposes of an engineer's lien priority. Instead, we agree with Stanley's interpretation based on the statute's plain language.

Idaho Code section 45-501 says that an engineer's mechanic's lien has priority dating back to the first professional services the engineer renders under contract regardless of where the services are rendered. Indeed, although this Court has not directly addressed the priority date of an engineer's lien for purposes of applying Idaho Code section 45-506, Idaho Code section 45-501's plain language unambiguously indicates that an engineer has a lien on services performed off-site and before construction commences, so long as those services were authorized under the relevant contract. Specifically, Idaho Code section 45-501's relevant language provides that an engineer under contract who "prepares or furnishes designs" or "renders any other professional service whatsoever for which he is legally authorized to perform in connection with any land or building development or improvement" has a lien on the same. This language, especially the "any other professional services whatsoever" phrase, unambiguously indicates that an engineer

9

has a lien on services performed off-site and before construction commences. Additionally, the language "estimates of cost" contemplates work performed before construction commences, which further supports the conclusion that an engineer's lien can attach to work performed off-site and before any physical work is done on the land.

The language that the engineer has a lien "upon the same for the work or labor done or professional services or materials furnished" may indicate that an engineer only has a lien if the professional services are actually furnished or delivered to whoever contracted for the services. While the lien may only attach if the services are actually furnished, the date for such a lien would likely be the date the services were "commenced to be furnished," rather than when the services were actually furnished. *See* I.C. § 45-506 ("The liens provided for in this chapter . . . . are preferred to any lien, mortgage or other encumbrance, which may have attached subsequent to the time when professional services were commenced to be furnished.").

IFA argues that allowing an engineer's lien to attach before the engineer delivers its plans or services goes against the purpose and intent of the statute, which is to compensate those who, by their work or materials, have contributed to improving the land. IFA asserts that this reading would compensate professionals regardless of whether their services contributed to the construction or improvement of the property. IFA's argument is not convincing because an engineer would only have a lien on services *actually* furnished under the contract, but the date for that lien would attach to when the engineer commenced to furnish the authorized services. Thus, an engineer would not be compensated for services that did not contribute to the construction or improvement of the project as IFA claims.

Because Idaho Code section 45-501's language is plain and unambiguous, we hold that an engineer under contract has a lien for professional services furnished with a priority date of when the engineer commenced to furnish "any authorized, professional services" under the contract regardless of where the services were rendered. Accordingly, the district court erred in ruling that an engineer's lien claim relates back only to the first date actual physical work was conducted on the property at issue. We vacate and remand this issue for further proceedings.

**B. IFA and IGP's Cross-Appeal and Knife River's Response.**

IFA and IGP cross-appeal the district court's decision granting Knife River's summary judgment motion on its lien claim for work Knife River performed paving both roadways and golf cart paths within Summer Wind Development. Between the time Knife River substantially

completed the main work on the roadways[3] and the time it began working on the cart paths, IFA recorded its deed of trust in July 2007. On October 27, 2007, Knife River filed its claims of lien for the $217,385.82 owed on the work it performed on the roadways and cart paths.

Both Knife River and IFA filed summary judgment motions with the district court. Knife River claimed it was entitled to summary judgment because it perfected its lien claims in accordance with Idaho law and its interest in the property was prior and superior to IFA's interest. IFA claimed it was entitled to summary judgment because Knife River's claims of lien were invalid due to gross overstatements that effectively constituted constructive fraud. Alternatively, IFA sought to subordinate Knife River's claims of lien on the grounds that Knife River did not designate on those lien claims the amounts due on the two separate projects as Idaho Code section 45-508 requires.

The district court found IFA's arguments, evidence, and authority unpersuasive and granted Knife River summary judgment, declaring Knife River's claims of lien valid and superior in priority to IFA's deeds of trust. First, the district court held that Knife River's Proposal covered the work Knife River performed on the roadways and cart paths. It also held that although there were two separate contracts between ELL and Union Land for the roadways and the cart paths, Knife River did not have notice of the two separate contracts. Second, the district court held that Idaho Code section 45-508's designation requirement did not apply in this case because cart paths and roadways were not "improvements" under Idaho Code section 45-508, and that even if they were improvements, they were not *separate* improvements for purposes of Idaho Code section 45-508. Consequently, the district court entered a judgment and decree of foreclosure allowing Knife River to recover the entire amount due for both the roadways and the cart paths.

On appeal, IFA argues that the district court erred twice—first, by allowing Knife River to tack two separate projects together thereby reviving an expired lien on the roadway; and second, by concluding that Idaho Code section 45-508 did not require Knife River designate on its claims of lien the amounts due for the roadways and the cart paths. Alternatively, IFA argues

---

[3] IFA contends that Knife River substantially completed work on the roadways on April 27, 2007, because this was the last date a Knife River Employee logged time under the job number 66062, the roadway job number. Knife River contends that some of the paving work it performed on August 29, 2007, was for approaches and culverts, which are part of the roadways for the highway district. Thus, Knife River contends that it was performing work on the roadways and cart paths under its contract with ELL only 57 days before it recorded its liens. The district court did not make a finding as to this issue because it found that there was only one contract for both the work done on the roadways and cart paths.

11

that the district court erred by entering a judgment and decree of foreclosure without first taking evidence regarding the amount of land necessary for the convenient use and occupation of the liened res.

Knife River responds that the record supports the district court's finding that Knife River performed all of the paving on the Summer Wind Development under a single unit price contract with ELL. Knife River also contends that IFA failed to present any evidence to prove that Knife River had actual or constructive knowledge of the contractual relationship between ELL and Union Land.

1. The district court erred when it granted Knife River's summary judgment motion.

The district court erred when it granted Knife River's summary judgment motion for the following reasons: (1) Knife River's Proposal was ambiguous and there is a genuine issue of material fact as to whether the cart paths were paved under Knife River's Proposal or a later separate contract; (2) the roadways and cart paths are "improvements" under Idaho Code section 45-508; and (3) Idaho Code section 45-505 required the district court to take evidence regarding the land necessary for the convenient use and occupation of the res subject to Knife River's lien claim. We will discuss each in turn below.

*a. Knife River's Proposal was ambiguous.*

Idaho Code section 45-501 provides that every person who performs labor, furnishes materials, or renders professional services in the construction of a building or other structure "has a lien upon the same for the work or labor done or professional services or materials furnished." The laws regarding materialman's liens are liberally construed in favor of the person who performs labor upon or furnishes materials to be used in the construction of a building. *L & W Supply Corp. v. Chartrand Family Trust*, 136 Idaho 738, 742, 40 P.3d 96, 100 (2002).

A lien claimant is required to file its lien claim within ninety days after the labor or services giving rise to the lien claim were completed. I.C. § 45-507. The ninety-day time period for filing a lien begins to run from the date the contract was substantially completed. *See Franklin Bldg. Supply Co. v. Sumpter*, 139 Idaho 846, 850, 87 P.3d 955, 959 (2004). This Court has held that when "a lien is filed within ninety days after the completion of the labor or services, the lien may encompass the entirety of the work performed under a single contract." *Credit Suisse AG v. Teufel Nursery, Inc.*, 156 Idaho 189, 321 P.3d 739, 745 (2014) (quoting *Terra–West, Inc. v. Idaho Mut. Trust, LLC*, 150 Idaho 393, 400, 247 P.3d 620, 627 (2010). Accordingly,

12

where a lien claimant provides labor or materials pursuant to two separate contracts, the claimant cannot utilize work performed under the second contract to render a claim of lien timely as to labor or materials provided under the first contract. *Valley Lumber & Mfg. Co. v. Driessel*, 13 Idaho 662, 93 P. 765, 768 (1907). Therefore, the first question is whether Knife River paved the roadways and golf cart paths under one continuous contract or two separate contracts.

However, even if one continuous contract controlled Knife River's paving work, it is not dispositive of the validity of Knife River's lien claim. IFA may still defeat Knife River's right of recovery by showing that two contracts existed between ELL and Union Land, and that Knife River had actual or constructive knowledge of the two contracts. *Valley Lumber,* 13 Idaho at 670, 93 P. at 768, 771–72. IFA can establish constructive knowledge "by way of lapse of time, cessation of work, occupation of the building and premises by the owner, settlement of accounts, or other circumstances that would amount to constructive notice to the materialman, and put him on his inquiry to ascertain that two contracts did in fact exist." *Id.* at 681, 93 P. at 772. First, we address whether the district court correctly found that only one contract—Knife River's Proposal—controlled between Knife River and ELL.

> i.  Relevant evidence from the record regarding the scope of Knife River's Proposal.

ELL entered into a contract with Union Land to perform site improvements to Summer Wind Development. The contract, dated June 11, 2006, identified the Scope of Work as: "Provide all labor, material, equipment, supervision and incidentals necessary to perform earthwork (Grading, Paving, and Pond Excavation) activities as specified in the Lochsa Engineering drawings, sheets 1-12 dated 06/14/06 and sheets 1-13 dated 04/11/06." ELL's President, Casey Daniels, testified that the scope of the work for this contract included the "paving of the roads and building the subdivision," and that the golf cart paths were not included in the plans he had at that time.

ELL then solicited bids for the paving that needed to be done under its contract, estimating that approximately 6,020 tons would be required. Knife River prepared a proposal quoting $64.50 per ton for placing and compacting asphalt, or $388,290 for the total 6,020 tons ELL estimated would be required. ELL accepted Knife River's Proposal on June 26, 2006. Knife River began paving on August 22, 2006.

On August 15, 2007, ELL sent Union Land a proposal for cart path work, and they entered into a contract the same day to provide "all labor, material, equipment, supervision and

13

incidentals necessary to . . . . Prep and Pave approximately 11,900 lineal feet of Cart Paths." On August 16, 2007, ELL requested that Knife River prepare a change order estimating its cost for supplying asphalt for and paving the cart paths. Knife River subsequently prepared a Small Job Worksheet reflecting the additional paving work on the cart paths.

In their summary judgment motions, the parties argued over whether Knife River's Proposal included only the roadways, or all paving throughout the Development, including the cart paths. Knife River argued that Knife River's Proposal included both the roadways and the cart paths. IFA argued that Knife River's Proposal only included work done on the roadways, and that the Small Job Worksheet was a separate contract for the cart paths.

Although the 6,020-ton figure did not include an estimate of how much asphalt would be needed to pave the cart paths, Daniels stated in his affidavit that Knife River's Proposal was an agreement for Knife River to provide "all labor, equipment and materials necessary to pave all asphalt throughout the Development." Daniels explained in his deposition that when ELL was soliciting bids for the paving, they did not know what paving would be required for the golf course. However, Daniels testified that ELL understood that it would be able to get additional asphalt for the golf course under Knife River's Proposal because ELL had discussed the cart path work with Knife River around the time Knife River submitted the Proposal. IFA also admitted a fax into evidence from Casey Daniels to Bob Larison, the President of Union Land, stating that "there was a verbal agreement between myself and Knife River to pave the cart paths at Summer Wind Golf Course" and that the agreed upon price was $68 per ton. While Daniels agreed that it was his signature on the letter, he had no recollection of signing it.

Jessee Rosin, the Knife River employee who prepared Knife River's Proposal, stated in his affidavit that Knife River intended that the materials, equipment, and labor for paving the cart paths constituted additional work under Knife River's Proposal. Rosin attached copies of daily work reports for the Summer Wind project to his affidavit, which described the dates and nature of work performed. Knife River's employees logged their time for the cart path work under job number 77423, while the job number 66062 was used for the roadway work. Despite having separate job numbers for the cart paths and the roadways, the daily work reports for the cart paths and the roadways generally reference the same job name: "Summerwind." Additionally, Knife River provided separate invoices to ELL for the work performed on the roadways and on

14

the golf cart paths, which bear the two different job numbers used for the work on the roadways and cart paths.

      ii.    <u>Knife River's Proposal was ambiguous as to whether it encompassed Knife River's work paving the golf cart paths.</u>

IFA and IGP both contend that Knife River performed the roadway work and cart path work under two separate contracts—Knife River's Proposal and the Small Job Worksheet. However, Knife River contends that Knife River's Proposal covered all of its work on the Summer Wind Development, including the cart paths that were listed on the Small Job Worksheet. In the district court's April 13, 2010 Order, the court determined that the affidavits of both Rosin and Daniels were prima facie proof that there was only one contract between Knife River and ELL. The court rejected IFA's assertion that differently numbered and referenced invoices were sufficient to support a finding that Knife River and ELL had two separate contracts for the roadways and the cart paths. Specifically, the court held that "in light of the absence of any documentary evidence or an affidavit by a person with knowledge connecting the invoices to separate contracts between [Knife River] and ELL, the court cannot find that a reasonable trier of fact could conclude, based solely on the invoices adduced by IFA, that two contracts existed between [Knife River] and ELL." Accordingly, the district court granted summary judgment in favor of Knife River, holding Knife River had a valid lien superior to IFA's deed of trust.

This Court's "primary objective when interpreting a contract is to discover the mutual intent of the parties at the time the contract is made." *Straub v. Smith*, 145 Idaho 65, 69, 175 P.3d 754, 758 (2007). The parties' intent should be ascertained from the contract's language. *Id.* If there are two different reasonable interpretations of the contract's language, a contract is ambiguous. *Id.* When a contract's interpretation is called into question, as it is here, summary judgment is appropriate only when the district court finds the contract language unambiguous as a matter of law. *Campagna v. Parker*, 116 Idaho 734, 737, 779 P.2d 409, 412 (1989). If relevant terms are ambiguous, it is the finder of fact's role to determine the meaning of those ambiguous terms, and summary judgment must be denied if there are disputed issues of fact regarding the meaning of the ambiguous contract language. *Id.*

In this case, the district court did not explicitly state that it found the contract between Knife River and ELL ambiguous. However, the district court moved past the four corners of the document and relied heavily on extrinsic evidence—including affidavits, invoices, and

15

deposition testimony—to determine the parties' intent as to the scope of work covered under the contract. Thus, the district court, in essence, found that the contract was ambiguous.

In any event, the contract is reasonably subject to conflicting interpretations. Knife River's Proposal for the project designated as "Summer Wind @ Orchard Hills, Ph. 1 & 2" did not expressly limit the scope of work to roadways, nor did it expressly provide that the paving work would include cart paths. Rather, it broadly described the scope of the work as:

Place and compact 3" of CL III ISPWC Plant Mix.

Approximately 6,020 TON @     $64.50     $388,290

Billing to be based on actual tonnage.

Knife River's Proposal does not state what the 6,020-ton estimate pertains to, other than giving the project name as "Summer Wind @ Orchard Hills Ph. 1 & 2." Nor does Knife River's Proposal state that ELL and Knife River intended Knife River to perform any and all paving associated with both the subdivision and the golf course contained within Summer Wind Development. The fact that Knife River's Proposal does not contain any language limiting the 6,020-ton estimate to paving of roadways does not mean that the Proposal includes any and all asphalt paving above and beyond the 6,020-ton estimate. However, Knife River's Proposal does provide some modification language: "Any alteration or deviation from above specifications involving extra costs will be executed only upon written orders and will become an extra charge over and above the estimate." Therefore, from the four corners of the document, Knife River's Proposal is unclear about whether it contemplated only the road work or all paving throughout the development, including the cart paths. Both interpretations are reasonable and the contract is therefore ambiguous. Because Knife River's Proposal is ambiguous as to the scope of the work, summary judgment was only appropriate if there were no disputed issues of fact regarding the ambiguous contract's meaning.

In their affidavits, Knife River and IFA presented conflicting extrinsic evidence about the scope of work Knife River and ELL intended Knife River's Proposal to cover. On one hand, Knife River presented affidavits from Daniels, of ELL, and Rosin, of Knife River, stating that Knife River's Proposal was to provide all labor, equipment, and materials necessary to pave all of the asphalt throughout the Development, which included, but was not limited to, paving the streets. The affidavits also stated that both ELL and Knife River intended the cart paths to be additional work performed under Knife River's Proposal and that the cart paths were included in

16

the scope of work Knife River initially agreed to perform for ELL. Finally, the Small Job Worksheet appears to be a written order Knife River's Proposal contemplates as additional work.

On the other hand, IFA points to the separate invoices and separate job numbers for the cart paths and roadways, as well as the letter that ELL allegedly sent to Union Land stating that ELL made an oral agreement with Knife River for Knife River to pave the cart paths. With respect to the job numbers, the record indicates that at the top of the Small Job Worksheet, "Summerwind Pathway" is hand-written and the job number is listed as 77423, which differs from the job number and job description corresponding with the roadwork. However, Knife River claims the different job numbers are merely internal job designations and are unrelated to contracts with its customers, or in this case, ELL. The Small Job Worksheet also lists the time frame for the cart path work as August 17, 2007 to August 29, 2007.

The following projected cost for the cart path work is also included on the Small Job Worksheet:

| | | |
|---|---|---|
| Place & Compact A/C PLNT Mix | 694 tons @ 65.40 = | 45,387.60 |
| Place & Compact ¾ Road Mix | 1572 tons @ 2.60 = | 4087.20 |
| | | 49,474.80 |

The price quoted for A/C plant mix in the Small Job Worksheet is different than that quoted in Knife River's Proposal. However, the slight increase in price is not dispositive evidence of separate contracts because Knife River's Proposal provided an escalation clause allowing Knife River to adjust the quoted price per ton in the event that liquid cement costs increased above $400 per ton. Moreover, there is testimony in the record that liquid cement costs did in fact increase between the time ELL accepted Knife River's Proposal and Knife River created the Small Job Worksheet. A further difference is that Knife River's Proposal was for placing and compacting three inches of CL III ISPWC plant mix, while the Small Job Worksheet provides for placing and compacting A/C plant mix. Also, in his deposition, Daniels testified that the mat thickness for the cart path was two inches, which was less than the three-inch thickness required for the roadways.

Furthermore, in addition to charging for A/C plant mix, the Small Job Worksheet includes a charge for work that was not included on the face of Knife River's Proposal—placing and compacting "¾ Road Mix." However, Daniels testified in his deposition that this charge was for ELL's use of Knife River's paver to lay the road mix because the cart paths were narrower

17

than ELL's dump trucks. Daniels explained that if the dump trucks were used to dump the road mix instead of Knife River's paver, then a quarter of the road mix would be wasted. Therefore, Daniels testified that to minimize cost and efficiently lay the base for the cart paths, ELL used Knife River's paver to lay the road mix: ELL still provided the material and the labor to operate the paver. In sum, the extra charge on the Small Job Worksheet reflects the cost for ELL's use of Knife River's equipment; not that Knife River performed work that was outside the scope of Knife River's Proposal.

Finally, although the Small Job Worksheet does not contain language explicitly stating that it is merely an extension of Knife River's Proposal, the words "Bill Proposal" are handwritten on the Small Job Worksheet. In his Affidavit in Opposition to IFA's Motion to Reconsider, Rosin testified that the "Bill Proposal" notation was a reference to Knife River's Proposal that ELL accepted and signed, signaling that Knife River would bill ELL for the cart path work under that Proposal.

Although the trial court is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and to grant the summary judgment despite the possibility of conflicting inferences, the record must reasonably support those inferences. Although it is a close call, this Court finds that the conflicting inferences raise a genuine issue of material fact as to the scope of the work Knife River's Proposal included. Therefore, summary judgment was inappropriate.

Because we find Knife River's Proposal ambiguous, we do not reach the issue of whether Knife River had actual or constructive notice of two contracts between ELL and Union Land. On remand, the district court should consider this Court's recent decision in *Credit Suisse AG v. Teufel Nursery, Inc.*, 156 Idaho 189, 321 P.3d 739 (2014), for guidance in determining whether one continuous contract governed the entirety of Knife River's paving at Sumer Wind Development. If it determines one contract controlled, it must then determine whether Knife River had actual or constructive knowledge of two contracts between ELL and Union Land. If it determines two contracts governed the roadways and the cart paths, it must make findings as to when Knife River substantially completed work under the first contract.

> b. *The district court erred when it held roadways and cart paths were not "improvements" under Idaho Code section 45-508.*

IFA and IGP also argue on cross-appeal that this Court should reverse the district court's decision that Knife River's claims of lien are superior to IFA's deeds of trust because Idaho

Code section 45-508 required Knife River to designate the amounts due on these separate projects on its claim of lien. The district court held that Idaho Code section 45-508 did not apply to Knife River's claims of lien because the roadways and cart paths were not "structures" for purposes of Idaho Code section 45-501, and therefore, were not "improvements" under Idaho Code section 45-508. The district court further held that even if they were improvements under section 45-508, they constituted a single improvement constructed under a single contract and, thus did not trigger section 45-508's designation requirement. IFA argues that the district court erred in this conclusion for two reasons: (1) the undisputed evidence shows that Knife River apportioned the work at every phase of the two projects; and (2) the language of Idaho Code section 45-501, the legislative history of the mechanic's lien statutes, and the language of the Contractor's Registration Act all point to the conclusion that roadways and cart paths are properly classified as "structures." Knife River responds that the district court properly classified Knife River's asphalt paving work throughout the Summer Wind Development as an improvement to the land to which Idaho Code section 45-508 does not apply.

Idaho Code section 45-508 states:

In every case in which one (1) claim is filed against two (2) or more buildings, mines, mining claims, or other improvements owned by the same person, the person filing such claim must, at the same time, designate the amount due him on each of said buildings, mines, mining claims, or other improvement; otherwise, the lien of such claim is postponed to other liens.

I.C. § 45-508. We have described this section as providing "a lien claimant the benefit of filing a single lien covering multiple improvements under common ownership, but, in order to maintain priority, the lien claimant must designate the amount owing as to each improvement." *Hopkins Nw. Fund, LLC v. Landscapes Unlimited, LLC*, 151 Idaho 740, 744, 264 P.3d 379, 383 (2011). Thus, there are two requirements for section 45-508 to apply to Knife River's paving work. First, the golf cart paths and roadways must be "improvements" under section 45-508. And second, the cart paths and roadways must be *separate* improvements rather than a single project.

      i. <u>Roadways and cart paths are "improvements" to which Idaho Code section 45-508's designation requirement applies.</u>

In analyzing the meaning of the term "improvements" within section 45-508, we noted in *Hopkins* that the "law has historically differentiated between improvements made on the land, such as buildings and structures, and work done to improve the land, itself, such as grading,

19

filling in, and leveling." 151 Idaho at 744, 264 P.3d at 383. We came to this conclusion by examining the use of the word "improvement" in Idaho Code section 45-501:

> Every person performing labor upon, or furnishing materials to be used in the construction, alteration or repair of any mining claim, building, wharf, bridge, ditch, dike, flume, tunnel, fence, machinery, railroad, wagon road …. or any other structure, *or who* grades, fills in, levels, surfaces or otherwise improves any land, .... has a lien upon the same for the work or labor done ….

*Id.* (quoting I.C. § 45-501) (emphasis in original). We stated that it "is obvious that the section creates two distinct types of liens—a lien against some form of structure, alternately referred to in later sections of the lien law [including Idaho Code section 45-508] as an 'improvement,' and a lien created in favor of one who improves the land itself, by grading, leveling, and the like." *Id.* at 744–45, 264 P.3d at 383–84. We then held that Idaho Code section 45-508 does not apply to the second type of lien created under section 45-501—improvements to the land itself. *Id.* at 745, 264 P.3d at 384. Based on this reasoning, we held that leveling, filling, berming, and contouring, and otherwise improving land in order to complete a golf course unquestionably constituted improvements to the land to which section 45-508 does not apply. *Id.* at 746, 264 P.3d at 385. Thus, for section 45-508 to apply in this case, we must determine whether the roadways and cart paths are structures or improvements to the land under section 45-501. Only if they are structures under section 45-501 will the roadways and cart paths be "improvements" for purposes of applying section 45-508.

In holding that the roadways and cart paths constitute improvements to the land rather than structures, the district court relied on the language from Knife River's Proposal, describing the work to be performed as "place and compact 3″ of CL III ISPWC Plant Mix." The court then concluded, "[T]he work described in [Knife River's] Proposal is best characterized as surfacing and/or improving the subject real property, as opposed to the construction of a structure or structures upon it." IFA argues that this was error because both a roadway and a golf cart path are similar to a "railroad" or a "wagon road," which are both listed as the first type of lien created under Idaho Code section 45-501 as "structures" on the land. We agree.

We do not see how paved roadways and cart paths are any different from railroads and wagon roads for purposes of characterizing them as structures under section 45-501. Railroads are built on the land and entail preparing a base, laying railroad ties over the base, and finally, laying steel rails over the railroad ties. Similarly, roadways and cart paths are built on the land and entail preparing subgrade for the road, placing and compacting base road mix, and finally,

20

placing and compacting the asphalt itself. Furthermore, Idaho Code section 45-501 lists wagon roads in its list of structures, and if wagon roads are structures, then surely paved roadways and cart paths are also structures for purposes of section 45-501.

Labeling paved roadways and cart paths as structures comports with the dictionary definition of "structure." Indeed, *Webster's Third New International Dictionary of the English Language* 2267 (Philip Babcock Gove et al. eds., G. & C. Merriam Co. 1971), defines structure as "something [that is] constructed or built" and provides the following example: "demolish any building, *highway*, *road*, railroad, excavation, or other structure." Because roadways and cart paths are analogous to railroads and wagon roads, and because calling roadways and cart paths structures is consistent with the dictionary definition of "structure," we hold roadways and cart paths are structures under Idaho Code section 45-501. Consequently, roadways and cart paths are "improvements" for purposes of applying Idaho Code section 45-508.

> ii. <u>The district court must make findings as to whether the roadways and cart paths are separate improvements that require Knife River to designate its claims.</u>

The district court held that even if the roadways and cart paths were structures for purposes of Idaho Code section 45-501, and, therefore, improvements for purposes of section 45-508, the roads and cart paths were not *separate* improvements as required to trigger Idaho Code section 45-508's designation requirement.

IFA argues that the roadways and the cart paths are two separate and distinct improvements because the two projects were: "(i) agreed to at separate times, (ii) performed at separate times, (iii) tracked under separate job numbers, (iv) invoiced under separate job numbers, and (v) constructed on different physical locations." Knife River responds that the subdivision and golf course in the Summer Wind Development are complementary to one another, and should rightfully be deemed part of the same broad project. Knife River explains that the Summer Wind Development is best described as "an integrated, multi-use project with residential building lots and a private golf course owned by the lot owners" and that from the outset, ELL considered the project to be "a subdivision and a golf course as one."

In *Hopkins*, we stated that it was "practical and functional to treat all work on a single project, for a single owner, and under a single contract, as a single improvement for purposes of section 508." 151 Idaho at 747, 264 P.3d at 386. Accordingly, we held that Landscapes Unlimited's work of grading, filling in, and otherwise improving the golf course constituted a

single improvement because the work was done pursuant to a single contract, and the labor and materials provided were for the benefit of the entire golf course and driving range, rather than for the individual improvements making up the golf course. *Id*. at 746, 264 P.3d at 385. Therefore, under our holding in *Hopkins*, "all work on a single project, for a single owner, and under a single contract" constitutes "a single improvement for purposes of section 508." *Id.* at 747, 264 P.3d at 386.

Knife River's paving was performed for a single owner: Union Land. However, there is still the question whether Knife River performed its work under a single contract and whether the subdivision and the golf course, and thus, the cart paths and roadways, were separate improvements or a single improvement. We therefore remand for the district court to make findings as to these issues. If it determines the roadways and cart paths were a single improvement under a single contract, the analysis in *Hopkins* applies, and Idaho Code section 45-508 does not apply. If it determines the roadways and the cart paths were separate improvements under two contracts, then Idaho Code section 45-508 applies.

> c. *The district court erred by entering a judgment and decree of foreclosure in favor of Knife River without first taking evidence regarding the amount of land necessary for the convenient use and occupation of the liened res pursuant to Idaho Code section 45-505.*

IFA argues that even if this Court disagrees with IFA's position on the two preceding issues, the matter should still be remanded to the district court with instructions to take evidence regarding the amount of land subject to Knife River's claims of lien. IFA contends that the district court erred by entering a judgment and decree of foreclosure without first taking evidence of the amount of land necessary for the convenient use and occupation of the liened res as required by Idaho Code section 45-505. Knife River responds that its liens are for constructing an improvement to the land under Idaho Code section 45-501 and, therefore, are not subject to Idaho Code section 45-505.

In relevant part, Idaho Code section 45-505 states:

The land upon which or in connection with which any professional services are performed or any building, improvement or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien . . . .

In *Hopkins*, this Court looked at the history of section 45-505 and its interplay with sections 45-505 and 45-508. The Court recognized that as written, section 45-501 "does not grant

22

a person performing work on a structure any lien rights against the land upon which the structure is built." *Hopkins*, 151 Idaho at 745, 264 P.3d at 384. Accordingly,

> The Territorial Legislature appears to have recognized this difficulty and responded with Section 5128 of the 1887 Statutes [now I.C. § 45–505], which allows a mechanic or materialman to obtain a lien upon the "land upon which . . . . any building, improvement or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof . . . . "

*Id.* This Court has previously recognized this interrelationship between sections 45-501 and 45-505 stating: "I.C. § 45-501 grants a right of lien to a materialman or laborer against a building, structure or other improvement. I.C. § 45-505 also grants a lien upon the land upon which such a building or structure is situated. I.C. §§ 45-501 & -505 must be construed In pari materia." *Chief Indus., Inc. v. Schwendiman*, 99 Idaho 682, 686–87, 587 P.2d 823, 827–28 (1978). Therefore, Idaho Code section 45-505's designation requirement must be applied where a person obtains a lien for building a structure on the land under Idaho Code section 45-501.

Because we hold today that the roads and cart paths are structures under Idaho Code section 45-501, the district court erred when it held Idaho Code section 45-505 did not apply. Therefore, on remand, the district court must take evidence regarding the land necessary for the convenient use and occupation of the structures subject to Knife River's lien claim.

## V. CONCLUSION

We hold that the district court erred when it determined an engineer's priority under Idaho Code section 45-506 for rendering professional services dates back to when the first on-site professional services were rendered. We further hold the district court erred when it granted summary judgment in favor of Knife River on its lien claim priority. Accordingly, the district court's judgments are vacated and the case is remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to Stanley.

Justices J. JONES, TROUT, J., Pro tem, SCHROEDER, J., Pro tem and KIDWELL, J., Pro tem, **CONCUR.**

23